IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTOPHER GARZA,
an individual,

No. 3:22-cv-00721-HZ

OPINION & ORDER

    Plaintiff,

  v.

CITY OF SALEM, an Oregon municipal
corporation; and OFFICER DAVID
BAKER, an individual,

    Defendants.

Gregory Kafoury
Jason Kafoury
Mark Gillis McDougal
Adam Kiel
Kafoury & McDougal
411 SW 2nd Ave Ste 200
Portland, OR 97204

   Attorneys for Plaintiff

Sebastian Tapia
City of Salem Legal Department
555 Liberty St SE Ste 225
Salem, OR 97301

Rebeca Plaza
Aaron Hisel
Capitol Legal Services
901 Capitol St NE
Salem, OR 97301

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Christopher Garza sued Defendants City of Salem and Officer David Baker for

false arrest, excessive force, and battery, alleging federal and state-law claims. Compl., ECF 1.

Defendants move for summary judgment on Plaintiff's false arrest claims only. Def. Mot. Summ.

J. 2, ECF 24. The Court held oral argument on July 10, 2023. For the following reasons, the

Court grants the motion with respect to Plaintiff's federal claim and denies it with respect to

Plaintiff's state-law claim.

## BACKGROUND

      Around midnight on September 17, 2021, Juan Gomez-Valles drove his car into the

parking lot of the "OK Tire Stores" in Salem, Oregon, because it was overheating. Kiel Decl. Ex.

A ("Gomez-Valles Dep.") 5:24-6:9, ECF 35-2; Montoya Decl. ¶ 7, Ex. 5 (photograph of

location), ECF 25-5. Gomez-Valles was intoxicated at the time and could not remember why he

stopped there. Gomez-Valles Dep. 6:13-15. Plaintiff Christopher Garza and Hector Gonzalez-

Nunez were at the business. Gomez-Valles Dep. 6:19-7:8. Gomez-Valles did not know either

man. *Id.* at 7:5-8. Gomez-Valles began checking his car, and Plaintiff and Gonzalez-Nunez asked

him what was wrong. *Id.* at 8:5-8. Plaintiff gave Gomez-Valles suggestions of things to try to

figure out what was wrong with his vehicle. Montoya Decl. ¶ 3, Ex. 1 ("Garza Dep.") 40:22-25, ECF 25-1. Gomez-Valles opened the hood of the vehicle. *Id.* at 41:2.

Defendant David Baker, a Salem police officer, was driving by OK Tires when he saw a man (later determined to be Plaintiff) sitting in the vehicle in the parking lot with the hood open and one door open. Montoya Decl. ¶ 5, Ex. 3 ("Baker Dep.") 28:4-7, 10-11, ECF 25-3. The car appeared dirty to him. *Id.* at 31:1-3. He believed the car may have been stolen, in part because it was a Honda and "Hondas are stolen often." *Id.* at 31:21-24. After Defendant Baker pulled into the parking lot of OK Tires, he saw the man exit the vehicle and saw two other men standing near the hood of the car. *Id.* at 32:20-25. Defendant Baker got out of his car and approached the men. *Id.* at 35:5-6; Garza Dep. 41:17-18. According to Defendant Baker, he said hi to Plaintiff and asked what was going on. Baker Dep. 35:6. According to Plaintiff, Defendant Baker did not greet him but immediately asked Plaintiff if he was stealing the car. Garza Dep. 41:17-18. Plaintiff responded, "I'm not stealing the car," and then said, "I didn't call you here. The neighbors didn't call you here. So why are you here?" *Id.* at 41:20-25. Defendant Baker responded that Plaintiff was stealing the car. *Id.* at 42:8.

At some point during the encounter, Plaintiff told Defendant Baker that he lived at the OK Tires shop. *Id.* at 50:5-8. Plaintiff parked his motor home at the tire shop with the shop owner's permission and paid rent. *Id.* at 27:23-28:22, 29:16-19. He told Defendant Baker he was trespassing on private property and needed to leave. *Id.* at 54:25-55:2. *See also* Baker Decl. ¶ 3, Ex. 1 at 2, ECF 38-1 ("One of the men, later ID'd as Garza, responded by telling me [Defendant Baker] I did not need to be there and to leave."). Plaintiff told Defendant Baker to run his ID and he could find out that he lived at the shop. Garza Dep. 55:20-23. He did not offer to show Defendant Baker his ID because he did not think he needed to. *Id.* at 56:3-9.

Plaintiff was upset and believed he was being profiled, so he turned away and walked back toward Gomez-Valles's car. *Id.* at 42:9-13, 58:12-14. Plaintiff believed he was profiled based on his race, but he had "no reason why" he believed that. *Id.* at 113:17-22. After Plaintiff walked away, Defendant Baker grabbed Plaintiff on the back of his neck, his shoulder, and his arm. *Id.* at 42:22-23. Defendant Baker was concerned that Plaintiff would retrieve something that could be used as a weapon, and he saw a small object in Plaintiff's left hand. Baker Dep. 41:1-6; Baker Decl. Ex. 1 at 2. Plaintiff experienced pain when Defendant Baker grabbed him. Garza Dep. 42:23-24. He said to Defendant Baker, "Are you on drugs? Are you on—are you on steroids? Stop. You're hurting me. Stop. I live here. Leave me alone." *Id.* at 42:25-43:2. The record is unclear as to whether Plaintiff also told Defendant Baker he lived at the shop before Defendant Baker grabbed him. Plaintiff asked to speak to a supervisor. *Id.* at 43:5-6. Plaintiff began swearing at Defendant Baker after Defendant Baker grabbed him. *Id.* at 58:15-18. Defendant Baker "wrestled [Plaintiff] around in front of the police car" and pulled his shoulder, telling him to "quit resisting." *Id.* at 43:8-10. Plaintiff responded that he was not resisting. *Id.* at 43:11.

Defendant Baker then handcuffed Plaintiff, holding his arm up and telling him to "quit resisting" as he did so. *Id.* at 43:12-15. He punched Plaintiff in the back of the head "a few times." *Id.* at 44:23-45:10. Plaintiff said, "I can't believe you're going to do what Floyd did to me—you did to Floyd." *Id.* at 45:21-23. Defendant Baker then stopped "manhandling" Plaintiff. *Id.* at 45:25-46:4. He sat Plaintiff on the bumper of the police car. *Id.* at 46:6-7. Plaintiff did not recall whether he was handcuffed when Defendant Baker struck him in the back of the neck. *Id.* at 46:10-12. Defendant Baker never told Plaintiff he was under arrest. *Id.* at 59:2-5. He did not tell Plaintiff why he had put him in handcuffs. *Id.* at 59:11-21.

After he handcuffed Plaintiff, Defendant Baker told Plaintiff he was being detained. Garza Dep. 59:23-60:4. He sat Plaintiff on the hood of the patrol car. *Id.* at 60:6-8. He then "slammed" Plaintiff into the back seat of the car. *Id.* at 60:9-22. The encounter was captured on surveillance video. Montoya Decl. ¶ 6, Ex. 4. The video shows that two officers arrived separately as backup within minutes of Defendant Baker's arrival on the scene. *Id.* at 02:40, 03:20. The first backup car arrived after Plaintiff was handcuffed. *Id.* at 02:40. The responding officer helped Defendant Baker put Plaintiff in the patrol car. *Id.* at 03:08-03:18. Defendant Baker closed the door of the car. Garza Dep. 62:12-14. The car windows were up. *Id.* at 62:15-16. Defendant Baker then got into the front seat and began looking up profiles in a database. *Id.* at 62:17-23. Plaintiff had not yet told Defendant Baker his name. *Id.* at 62:24-25.

During the time he lived in his motor home at the tire shop, Plaintiff had called the police approximately three to four times. *Id.* at 32:24-33:9. He called to report that people were trespassing and stealing tires. *Id.* at 33:10-18. He stated that there was a lot of trespassing and theft at the business. *Id.* at 33:25-34:3. One time, Plaintiff saw the police arrest someone who stole something from the business and ran from the police. *Id.* at 34:15-25. Plaintiff was listed as the responsible person for the business so that the police could contact him. *Id.* at 35:5-9. Plaintiff also called the police to report theft from his mobile home, and the police responded. *Id.* at 35:21-36:5. Plaintiff had not met Defendant Baker before the night of September 17, 2021. *Id.* at 36:8-10. Defendant Baker testified that he was familiar with the OK Tires location from driving by but could not recall responding to prior calls at the location. Baker Dep. 28:12-22.

Ultimately, Defendant Baker found a picture of Plaintiff. Garza Dep. 65:6-8. Plaintiff did not know how Defendant Baker found out his name or found the picture. *Id.* at 65:15-16, 66:2-4. Defendant Baker testified that he believed another officer got Plaintiff's name and he used that to

look Plaintiff up. Baker Dep. 53:10-14. Plaintiff was released just under ten minutes after he was

handcuffed and placed in the patrol car. Montoya Decl. Ex. 4 at 02:40, 12:20.

Gomez-Valles was also handcuffed, but he was not placed in a patrol car. Gomez-Valles

Dep. 11:6-9. He asked one of the officers why they responded to the scene, and the officer said,

"I see three Hispanics at a auto shop when it's closed . . . on a car with the hood open[.]" *Id.* at

11:18-21. The officer who said this was not the same officer who handcuffed Plaintiff. *Id.* at

12:13-15. Gomez-Valles reported that the officer said he did not know if the car was stolen. *Id.* at

12:1-2. Gomez-Valles told him it was not stolen and to check his VIN. *Id.* at 12:2-3. The officer

did so, and he confirmed the car belonged to Gomez-Valles. *Id.* at 12:4-6, 21:1-3. The car keys

were in the ignition when Defendant Baker arrived at the scene, and the police returned them to

Gomez-Valles after they confirmed the car was his. *Id.* at 21:5, 16-24.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th

Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendants are entitled to summary judgment on Plaintiff's federal false arrest claim, but not his state-law false arrest claim. Defendant Baker had objectively reasonable suspicion to stop Plaintiff. However, viewing the facts in the light most favorable to Plaintiff, the stop became an arrest, and it is undisputed that Defendant Baker did not have probable cause to arrest Plaintiff. But he is entitled to qualified immunity on Plaintiff's federal false arrest claim.

## I.     Federal Claim

### A.     Fourteenth Amendment Claim

Defendants move that the Court dismiss Plaintiff's First Claim for Relief to the extent it attempts to state a claim for false arrest or excessive force under the Fourteenth Amendment. Def. Mot. Summ. J. 7-8. The First Claim for Relief states, "(Fourth and Fourteenth Amendment (False Arrest and Excessive Force) – Defendant Baker)." Compl. 3. It also states, "The above-described stop, detention, and excessive force were intentional, were done without probable cause and were in violation of plaintiff's Constitutional rights and the Fourth Amendment and

Fourteenth Amendment, and such claims are made under 42 USC §1983 against Officer David

Baker." *Id.* ¶ 10. At oral argument, counsel for Plaintiff clarified that the citation to the

Fourteenth Amendment was not intended to make a claim under the Fourteenth Amendment. The

Court proceeds to analyze Plaintiff's claims under the Fourth Amendment only, as it is the basis

for all excessive force and false arrest claims. *Larson v. Neimi*, 9 F.3d 1397, 1400-01 (9th Cir.

1993).

      B.      Fourth Amendment Claim

Plaintiff alleges that Defendant Baker detained him in violation of his Fourth Amendment

rights. Compl. ¶ 10. The Court concludes that Defendant Baker had reasonable suspicion to

detain Plaintiff. However, viewing the facts in the light most favorable to Plaintiff, the detention

transformed into an arrest. But Defendants are still entitled to summary judgment on the claim

because Defendant Baker is entitled to qualified immunity.

      i.      Reasonableness of Detention

The Fourth Amendment protects against "unreasonable searches and seizures." U.S.

Const. amend. IV. A seizure of a person is "physical force or a show of authority that in some

way restrain[s] the liberty of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (citing

*Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)) (internal quotations omitted). "[A] person has been

'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to

leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In general, police must have probable cause before making an arrest. *Terry*, 392 U.S. at

20. However, "the police can stop and briefly detain a person for investigative purposes if the

officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be

afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989)

(citing *Terry*, 392 U.S. at 30). Probable cause is "a fair probability that contraband or evidence of

a crime will be found." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Reasonable suspicion is a

lower standard, but the officer still must show "'some minimal level of objective justification'

for making the stop." *Sokolow*, 490 U.S. at 7 (quoting *INS v. Delgado*, 466 U.S. 210, 217

(1984)). "The officer, of course, must be able to articulate something more than an 'inchoate and

unparticularized suspicion or "hunch."'" *Id.* (quoting *Terry*, 392 U.S. at 27).

### a.    Relevance of Evidence of Racial Bias

Plaintiff points to evidence that the race or ethnicity of Plaintiff and the other two men

working on the car contributed to Defendant Baker's decision to stop and investigate. Pl. Resp.

1-2, ECF 35. Gomez-Valles stated that one of the officers told him that seeing "three Hispanic

males working on a car" at a closed auto shop at night was part of the suspicious circumstances.

Gomez-Valles Dep. 20:17-19. However, Gomez-Valles also testified that the officer who said

this to him was not the same one who handcuffed Plaintiff (i.e., Defendant Baker). *Id.* at 12:13-

15, 21:6-9. When asked why he believed he had been racially profiled, Plaintiff stated that he did

not have a reason. Garza Dep. 113:17-22. The only evidence of racial animus in the record is a

statement by an officer who responded to the scene after Defendant Baker had detained Plaintiff.

Evidence of this second officer's racial bias is not probative of Defendant Baker's motivations in

stopping Plaintiff. *See, e.g.*, *Howard v. City of Los Angeles*, No. CV 14-3687 SS, 2017 WL

11628117, at *5 (C.D. Cal. Mar. 23, 2017) (holding that testimony by witnesses who alleged that

defendant officers had treated them in a racially biased manner in other incidents was not

probative of racial bias where the officers did not initiate the encounters). Plaintiff alleges

discrete acts by Defendant Baker in his capacity as a Salem Police Officer. The statement of an

officer who was not involved in the decision to stop Plaintiff and who responded to the scene after Plaintiff had been detained is not relevant to an analysis of Defendant Baker's decisionmaking. There is no admissible evidence of racial bias in the record.

Even if the evidence were admissible, it would not create a genuine dispute of material fact as to whether Defendant Baker had reasonable suspicion to stop Plaintiff. Defendants correctly point out that subjective racial bias is irrelevant to the determination of whether Defendant Baker had reasonable suspicion to stop Plaintiff. Def. Reply 2-4, ECF 36. The Supreme Court has rejected "the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred." *Whren v. United States*, 517 U.S. 806, 811 (1996). The *Whren* Court concluded that precedent "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id.* at 813. And the Ninth Circuit has held that evidence of racial bias may be relevant to a Fourth Amendment claim, but for reasons other than whether the officer had reasonable suspicion to stop an individual or probable cause to arrest an individual. *Price v. Kramer*, 200 F.3d 1237, 1251 (9th Cir. 2000) (holding that evidence of racial bias was relevant to explaining why the officers stopped the plaintiffs without probable cause or reasonable suspicion, why the officers' testimony should not be credited, and why plaintiffs should be awarded punitive damages).

Racial bias in policing may be relevant to other claims: "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren*, 517 U.S. at 813. Other courts in this district have recognized the distinction. *E.g.*, *Nickerson v. Portland Police Bureau*, No. CIV. 08-217-HU, 2008 WL 4449874, at *7, *9 (D. Or. Sept. 30, 2008) (construing pro se plaintiff's claim of racial

discrimination in policing as a claim under the Equal Protection Clause and concluding that City's argument that officer had probable cause to stop plaintiff did not defeat the claim because it was relevant only to a Fourth Amendment claim). In sum, the officer's statement about "three Hispanic males" does not create a genuine dispute of material fact as to whether Defendant Baker had reasonable suspicion to stop Plaintiff.

> b.      Reasonable Suspicion

Defendants argue that Defendant Baker had reasonable suspicion that Plaintiff was engaged in one of the following crimes: Criminal Trespass in the Second Degree, O.R.S. 164.245; Unlawful Entry into a Motor Vehicle, O.R.S. 164.272; or Theft in the First Degree, O.R.S. 164.055. Def. Reply 7. Plaintiff asserts that in the light most favorable to him, the stop began when Defendant Baker got out of his patrol car and asked Plaintiff why he was stealing the Honda, and "seeing people working under the hood of a Honda in the parking lot of a closed business after dark" does not constitute reasonable suspicion of theft. Pl. Resp. 3. Plaintiff relies on *United States v. Bigsby*, 145 F. App'x 595, 596-97 (9th Cir. 2005) and *United States v. Reyes*, 225 F. App'x 699, 700 (9th Cir. 2007).

The Court first addresses Plaintiff's argument that the stop began when Defendant Baker approached him and asked him if he was stealing the Honda. This position is foreclosed by precedent. The Supreme Court has held that an officer's "show of authority" without accompanying physical force does not effect a seizure if the suspect does not yield. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that no seizure occurred where officer called to fleeing suspect to halt and suspect did not comply). Assuming Defendant Baker's question about theft constitutes a show of authority, Plaintiff did not submit to it. Plaintiff responded to Defendant Baker's question by saying that he did not steal the car, asking Defendant Baker why

he was there, and then turning and walking away. Garza Dep. 41:20-25, 42:9-13. And there is no evidence that Defendant Baker touched Plaintiff until after Plaintiff turned to walk away. Plaintiff was not seized until Defendant Baker physically touched him.

Plaintiff also questions whether Defendant Baker "held a *subjective* suspicion that a crime was being committed," pointing to Defendant Baker's testimony that he did not know whether he had seen a car theft or innocent behavior. Pl. Resp. 3 (citing Baker Dep. 35:1-4). Because the reasonable suspicion standard is objective, Defendant Baker's subjective suspicion is irrelevant.

Defendant Baker had reasonable suspicion to stop Plaintiff. It is undisputed that he observed Plaintiff sitting in a dusty vehicle with the hood and door open in the parking lot of a closed auto shop in the middle of the night, with two other men standing near the car. Baker Dep. 28:4-7, 10-11; 31:1-3. These circumstances created reasonable suspicion that Plaintiff was committing Criminal Trespass in the Second Degree, O.R.S. 164.245; Unlawful Entry into a Motor Vehicle, O.R.S. 164.272; or Theft in the First Degree, O.R.S. 164.055.

The cases on which Plaintiff relies do not support his position that Defendant Baker lacked reasonable suspicion to stop him. In *Bigsby*, the Ninth Circuit upheld the district court's conclusion that the officers lacked reasonable suspicion to stop the defendant's vehicle because "there was no 'particularized' conduct by the driver and passenger in" the defendant's vehicle, and the "zone of suspicion" surrounding another vehicle did not on its own establish reasonable suspicion. 145 F. App'x at 596. The officers stopped the defendant "in a *public* parking lot in plain view from the road" despite only having reasonable suspicion with respect to another vehicle. *Id.* (emphasis in original). And "the officers did not see [defendant's vehicle] arrive or even enter the 'zone of suspicion' around" the suspicious vehicle. *Id. Bigsby* is inapposite

because Defendant Baker stopped Plaintiff at a closed *private* business based on Plaintiff's own

activities, not his mere presence in a public area.

In *Reyes*, the Ninth Circuit held that the government lacked reasonable suspicion to stop

the defendant for drug dealing when the officer went to a harbor in reliance on an anonymous tip

and observed two vehicles parked facing each other in an otherwise empty parking lot. 225 F.

App'x at 700-01. The evidence at trial showed that the manner in which the vehicles were parked

was not typically suspicious. *Id.* at 701. *Reyes* is inapposite because Defendant Baker saw

Plaintiff sitting in a dusty vehicle with the door and hood open in the parking lot of a closed auto

shop in the middle of the night with two other men standing around the vehicle. Baker Dep.

28:4-7, 10-11; 31:1-3. Those circumstances are more suspicious than simply parking two cars to

face each other in a parking lot.

Plaintiff argues that although he turned away from Defendant Baker after Defendant

Baker questioned him about stealing the Honda, Defendant Baker still lacked reasonable

suspicion to stop him. Pl. Resp. 4. Plaintiff relies on *Liberal v. Estrada*, 632 F.3d 1064, 1078

(9th Cir. 2011) and *United States v. Green*, 925 F.2d 1471 (9th Cir. 1991) (unpublished). The

Court will not consider *Green* because it is an unpublished Ninth Circuit opinion issued before

January 1, 2007, and is not being cited for one of the purposes permitted by the Ninth Circuit.

*See* 9th Cir. R. 36-3; *Banks v. Walker*, No. 2:07-CV-02022-AK, 2011 WL 149846, at *1 (E.D.

Cal. Jan. 18, 2011) (refusing to consider unpublished decision issued before January 1, 2007).

*Liberal* does not support Plaintiff's argument. In *Liberal*, the Ninth Circuit held that the

defendant officer lacked reasonable suspicion to stop the plaintiff because there was no evidence

that the plaintiff had violated the law, and the plaintiff's driving to avoid the officer could not, on

its own, constitute reasonable suspicion. 632 F.3d at 1078. *Liberal* is inapposite because it is undisputed that Defendant Baker relied on factors besides Plaintiff's avoidance of him.

The Court agrees with Defendants that this case is closer to *United States v. Helm*, 733 F. App'x 385, 386-87 (9th Cir. 2018). In *Helm*,

> [T]he officer spotted a truck parked in the parking lot of what he believed was a closed business. Two males were sitting in the truck, and a male and female were standing outside the truck, near the passenger door. The males inside the truck appeared "dazed" and began moving around inside the truck as if hiding or moving something, and the individuals outside the truck left. The driver grew agitated when the officer asked the occupants for their names, and Helm reached into his waistband and moved something toward the center of the seat.

*Id.* at 387. The Ninth Circuit concluded that these facts gave the officer reasonable suspicion of criminal activity. *Id. Helm* is closer to the facts here than the cases Plaintiff cites.

Plaintiff points to evidence that Salem police knew he was living at the tire shop. Pl. Resp. 2-3. However, Plaintiff also testified that he did not offer to show Defendant Baker his ID because he did not think he needed to. Garza Dep. 56:3-9. He testified that he had never met Defendant Baker before the night of the incident. *Id.* at 36:8-10. And Defendant Baker testified that although he had driven by the shop, he had not responded to any calls at the OK Tires shop before. Baker Dep. 28:12-22. No evidence in the record indicates that Plaintiff identified himself to Defendant Baker before turning away from him. Indeed, Plaintiff testified that he had not yet told Defendant Baker his name when Defendant Baker put him in the patrol car and began looking up profiles. Garza Dep. 62:24-25. Viewing the evidence in the light most favorable to Plaintiff, the Salem Police had records indicating that Plaintiff lived at the tire shop, but Defendant Baker did not know Plaintiff's identity until after he detained Plaintiff. Without knowing who Plaintiff was, Defendant Baker was not required to simply accept Plaintiff's statement that he lived at the tire shop. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024

(9th Cir. 2009) ("[Plaintiff's] innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus."). In sum, Defendant Baker had reasonable suspicion to stop Plaintiff.

c.    Whether the Stop Became an Arrest

Plaintiff asserts that Defendant Baker's actions converted the stop into an arrest and that he lacked probable cause to arrest Plaintiff. Pl. Resp. 5. "There is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). "[C]ourts consider the totality of the circumstances." *Id.* (internal quotations omitted). The factors to balance include "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* (citation omitted). Thus, certain tactics may be reasonable in one case and unreasonable in another, and the same police conduct may constitute an arrest in one case and a stop in another. *Id.* at 1185-86. The Ninth Circuit has advised that "[u]nder ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Id.* at 1187. But such measures may be appropriate under certain circumstances, including:

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur.

*Id.* at 1189. Courts should also consider how many officers are present. *Id.* at 1190.

The Ninth Circuit has held that handcuffing a suspect does not convert a stop into an arrest where the suspect is sufficiently uncooperative. For example, in *United States v. Taylor*, the Ninth Circuit held that handcuffing a suspect and frisking him for weapons was justified where the suspect had twice disobeyed an order to raise his hands and "made furtive movements inside the truck where his hands could not be seen," and there were two suspects on the scene and "only two or three officers." 716 F.2d 701, 709 (9th Cir. 1983). It was also reasonable to require the suspect to remain handcuffed and prone for three to five minutes because he was "rowdy" and "verbally abusive." *Id.* In contrast, in *Green v. City & County of San Francisco*, the stop became an arrest where the plaintiff was handcuffed even though she complied with all instructions and was alone, while at least four officers were present. 751 F.3d 1039, 1048 (9th Cir. 2014).

The Ninth Circuit has also held that placing a suspect in the back of a patrol car does not convert the stop into an arrest where the detention is no longer than necessary for a legitimate investigation. *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (holding that detention of plaintiff for approximately 45 minutes in patrol car was not an arrest because it was no longer than necessary to determine whether plaintiff was the suspect in a burglary and ended as soon as officers determined he was not); *Haynie v. Cnty. of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003) (holding that detention did not become an arrest where plaintiff was handcuffed for sixteen to twenty minutes and placed in patrol car after "continued yelling" and refusal to obey officer's orders, which disrupted officer's investigation).

Plaintiff argues that the stop became an arrest when Defendant Baker handcuffed him and put him in the patrol car. Pl. Resp. 5. He asserts that none of the four factors justifying such actions were present. *Id.* at 6. Defendants counter that it is undisputed "that Plaintiff was

uncooperative and took actions during his contact with Officer Baker that reasonably led Officer Baker to be concerned for his safety." Def. Reply 10. While the parties dispute what Defendant Baker said when he approached Plaintiff, it is undisputed that Plaintiff asked him why he was there in a manner indicating that he should leave, and shortly thereafter turned away from him and walked back toward the Honda. Garza Dep. 41:23-25; 42:9-13. In the light most favorable to Plaintiff, Defendant Baker then grabbed Plaintiff on the back of his neck, his shoulder, and his arm. *Id.* at 42:22-23. He punched Plaintiff in the back of the head "a few times" while he was handcuffing Plaintiff. *Id.* at 44:23-45:10. Plaintiff began swearing at Defendant Baker after Defendant Baker grabbed him. *Id.* at 58:15-18. It is undisputed that at that time Defendant Baker was the only officer on the scene, while Plaintiff and two other men were working on the car. *Id.* at 41:2-12. A backup officer arrived and helped Defendant Baker place Plaintiff in the patrol car. Montoya Decl. Ex. 4 at 02:40-03:18. A second officer responded soon after. *Id.* at 03:20.

Under the circumstances, the handcuffing of Plaintiff and placing him in the patrol car did not convert the stop into an arrest. Plaintiff was uncooperative and yelling at Defendant Baker, who was the only officer at the scene when he handcuffed Plaintiff. It was reasonable to place him in the patrol car to allow the investigation to proceed. The record shows that Plaintiff was detained no longer than necessary to confirm his identity and right to be at the tire shop and the ownership of the Honda.

Plaintiff argues that Defendant Baker did not do a basic investigation that would have shown no crime was committed because the key was in the Honda's ignition the whole time. Pl. Resp. 6. This argument lacks merit. As Defendants point out, Plaintiff's own conduct impeded the investigation. Def. Reply 11. Plaintiff testified that when Defendant Baker approached him, he said he was not stealing the Honda, asked him why he was there and said no one called him,

and then turned back toward the Honda, where the other two men were standing. Garza Dep. 41:20-25, 42:9-13. It is unreasonable to suggest that Defendant Baker should have simply approached the vehicle to examine it under those circumstances. And while the presence of the key in the ignition does tend to show that the car was not stolen, it is not as definitive as Plaintiff suggests. A case Plaintiff cites, *Ramirez v. City of Buena Park*, underscores this. In *Ramirez*, a police officer detained the plaintiff on suspicion of being under the influence of a controlled substance. 560 F.3d at 1016. The plaintiff had an elevated pulse, told an implausible story about why he had been sleeping in his car in a parking lot, and took forty-five seconds to estimate the passing of thirty seconds, all of which supported the officer's suspicions, but he also "performed the finger to nose test perfectly." *Id.* at 1023. The Ninth Circuit held that while the plaintiff's performance on the finger to nose test was relevant, his "innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus." *Id.* at 1024. Similarly, the presence of the key in the ignition does not on its own dispel the other suspicious circumstances Defendant Baker observed.

Other than pointing to the key in the ignition, Plaintiff does not argue that Defendant Baker and the later-responding officers took an unreasonable amount of time to confirm the ownership of the vehicle or confirm Plaintiff's identity. The video of the incident shows that the entire incident lasted under fifteen minutes and that Plaintiff was handcuffed for approximately ten of those minutes and placed in the patrol car for just under ten minutes. Montoya Decl. Ex. 4 at 02:40, 12:20. This is also uncontested. Plaintiff was released once officers had determined his identity and right to be at the auto shop and the ownership of the Honda. Plaintiff testified that he did not offer to show his ID or tell Defendant Baker his name, either of which would have shortened the time it took Defendant Baker to confirm Plaintiff's story. Viewing the facts in the

light most favorable to Plaintiff, the length of time he was handcuffed and placed in the patrol car was not unreasonable and did not convert the stop into an arrest.

However, viewing the facts in the light most favorable to Plaintiff, Defendant Baker also punched Plaintiff in the back of the head more than once while he was handcuffing Plaintiff. Although this alleged conduct is most relevant to Plaintiff's excessive force claims, which are not the subject of the present motion, it must also be considered in determining whether the stop became an arrest. Punching bears on "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted[.]" *Lambert*, 98 F.3d at 1185. *See also Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013-14 (9th Cir. 2002) (pointing of gun at plaintiff's head was relevant in deciding both whether there was a seizure and whether excessive force was used).

When the punching is added to the restrictive measures discussed above, the detention must be considered an arrest. Plaintiff agrees that he was upset and yelling, but he also contends that he was not resisting Defendant Baker's attempt to handcuff him. Garza Dep. 43:11, 58:15-18. Defendant Baker had no reports of dangerous criminal activity, did not believe Plaintiff to be armed, and was not investigating violent crimes. Under those circumstances, if Plaintiff was vocal but not resisting, Defendant Baker was not justified in punching Plaintiff while handcuffing him. In the light most favorable to Plaintiff, the stop became an arrest. Defendant Baker does not argue that he had probable cause to arrest Plaintiff, and the record does not show that he had probable cause. Accordingly, Defendants are only entitled to summary judgment on Plaintiff's Fourth Amendment claim if Defendant Baker is entitled to qualified immunity.

ii.    Qualified Immunity

Defendants argue that Defendant Baker is entitled to qualified immunity. Def. Mot.
Summ. J. 11. "Qualified immunity attaches when an official's conduct does not violate clearly
established statutory or constitutional rights of which a reasonable person would have known."
*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted). "To
determine whether [an officer] violated clearly established law, we look to cases relevant to the
situation [the officer] confronted, mindful that there need not be a case directly on point." *A.K.H.
rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (internal quotation marks
and citation omitted). And while there need not be a case directly on point, "existing precedent
must place the lawfulness of the particular [action] beyond debate," for which "a body of
relevant case law is usually necessary." *City of Escondido v. Emmons*, 139 S. Ct. 500, 504,
(2019) (internal quotation marks and citation omitted). The facts are to be viewed in the light
most favorable to the nonmoving party in determining whether qualified immunity applies.
*Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019).

In the light most favorable to Plaintiff, Defendant Baker arrested Plaintiff when he lacked
probable cause to do so. This violated Plaintiff's Fourth Amendment rights. While it is clearly
established at a high level of generality that arrests require probable cause, the specific issue in
this case is whether it was clearly established that the seizure of Plaintiff was an arrest rather
than a stop.

Plaintiff argues that the cases he cited in his brief show that Defendant Baker violated
clearly established law. Pl. Resp. 9. But the Court found Plaintiff's cases factually distinct.[1]

---

[1] The Court here considers only the federal cases Plaintiff cited, as qualified immunity is only a
defense to Plaintiff's federal claims, not his state-law claims. *Johnson v. Bay Area Rapid Transit
Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013).

Plaintiff also points to two disputed factual issues: "whether Officer Baker immediately accused Plaintiff of theft as the first words they exchanged, and whether the men's race was considered in deciding to approach the scene as a suspected theft." Pl. Resp. 9. Neither of these issues affects the qualified immunity analysis. The first is irrelevant because the stop did not begin when Defendant Baker asked Plaintiff whether he had stolen the Honda. The second is irrelevant because the only evidence of racial bias in the record is not admissible and because an otherwise lawful stop is not invalidated where the officer has an impermissible pretextual motive but also relies on objectively reasonable factors. *Whren*, 517 U.S. at 813.

The issue here is not the reasonableness of Defendant Baker's suspicion but the reasonableness of the restrictive measures he took in detaining Plaintiff. Defendant Baker relied on objectively reasonable factors in deciding to detain Plaintiff, as discussed above. This case is unlike cases in which the officers clearly lacked reasonable suspicion. *E.g.*, *Lambert*, 98 F.3d at 1193 (holding that officers were not entitled to qualified immunity for "highly intrusive" stop where the facts were that the plaintiffs "were both relatively young African–American men, that they were out together, and that their heights were in the same general range as the suspects'"). Rather, the Court evaluates whether it was clearly established at the time of the incident that Defendant Baker's restrictive measures—punching a suspect while handcuffing that suspect and then placing the suspect in a patrol car for approximately ten minutes—constituted an arrest where the suspect was vocal and uncooperative but did not resist the handcuffing and there was reasonable suspicion that the suspect had committed nonviolent offenses such as theft or trespass.

No clearly established Supreme Court or Ninth Circuit law places the lawfulness of Defendant Baker's restrictive measures beyond debate. In *Lambert*, the Ninth Circuit held that

the defendant officers were not entitled to qualified immunity on the plaintiffs' false arrest claim where around seven officers gathered to detain the two men, ordered them out of their vehicle at gunpoint, told them to stand facing the wall with their hands on their heads, handcuffed them, patted them down, and placed them in separate patrol cars. 98 F.3d at 1184. The officers had meager facts to support their actions: "[a]t most there were two African–American men, one short and one tall, in the city of Santa Monica, at night, who appeared to a police officer to be both nervous and casual." *Id.* at 1192. Faced with this wide disparity between evidence of criminal activity or dangerousness and the restrictive measures taken, the Ninth Circuit concluded that "any reasonable juror would be compelled to find on these facts that the stop was an arrest." *Id.* The officers were not entitled to qualified immunity. *Id.* at 1193.

In *Taylor*, two officers approached the two suspects, who were in a vehicle, with guns drawn. 716 F.2d at 708. They knew from experience that one of the suspects was likely to be dangerous. *Id.* One of the officers twice ordered one of the suspects to raise his hands, but the suspect did not comply and "made furtive movements with his hands inside the vehicle." *Id.* After the officer gave the order a third time, the suspect obeyed, and the officer then ordered him to lie facedown in a ditch. *Id.* He was handcuffed and frisked. *Id.* The Ninth Circuit held that the officer's actions did not convert the stop into an arrest, as the suspect had twice disobeyed an order and had made furtive movements, and "there were two suspects and only two or three officers on the scene." *Id.* at 709. It was also reasonable to leave the handcuffs on for several minutes after the suspect was frisked because he was "extremely verbally abusive" and "quite rowdy." *Id.*

This case falls between *Lambert* and *Taylor*. It is not like *Lambert* because (1) Defendant Baker had a stronger basis to detain Plaintiff, (2) Plaintiff was uncooperative with Defendant

Baker, and (3) Defendant Baker was the only officer at the scene when he detained Plaintiff. And it is not like *Taylor* because (1) there was no reason to believe Plaintiff was armed or dangerous, and (2) Plaintiff was not rowdy or verbally abusive after he was placed in the patrol car. But the officer-to-subject ratio here is more unbalanced than the ratio in *Taylor*. This Court did not find a case with similar enough facts to show a violation of clearly established law.

No precedential case clearly establishes that Defendant Baker's actions converted the stop into an arrest. Defendant Baker is therefore entitled to qualified immunity on Plaintiff's Fourth Amendment false arrest claim. The Court does not decide whether Defendant Baker is entitled to qualified immunity on Plaintiff's excessive force claim, as Defendants' motion does not address that claim. The Court now turns to Plaintiff's state-law false arrest claim.

## II.    State-Law Claim

Defendants are not entitled to summary judgment on Plaintiff's state-law false arrest claim. Defendant Baker had objectively reasonable suspicion to stop Plaintiff, but there is a genuine dispute over whether he subjectively believed Plaintiff had committed or was about to commit vehicle theft. And viewing the facts in the light most favorable to Plaintiff, the stop became an arrest, and Defendant Baker lacked probable cause to arrest Plaintiff.

### A.    Legal Standard

Article I, section 9, of the Oregon Constitution "protects against warrantless searches and seizures." *State v. Brown*, 318 Or. App. 713, 719, 508 P.3d 45 (2022). "[A] seizure occurs when (1) a law enforcement officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *State v. Reyes-Herrera*, 369 Or. 54, 58, 500 P.3d 1 (2021) (citing *State*

*v. Ashbaugh*, 349 Or. 297, 316, 244 P.3d 360 (2010)). Seizures includes both arrests and stops.

*Brown*, 318 Or. App. at 719.

"A 'stop' occurs when the police restrain a person's liberty by physical force or show of

authority." *State v. Anfield*, 95 Or. App. 567, 570, 770 P.2d 919 (1989).

> "For police officers to make a stop, they must reasonably suspect—based on specific and articulable facts—that the person committed a specific crime or type of crime or was about to commit a specific crime or type of crime. For a court to determine that an investigative stop was lawful under Article I, section 9, the court (1) must find that the officers actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, based on the record, that the officers' subjective belief—their suspicion—was objectively reasonable under the totality of the circumstances existing at the time of the stop."

*Brown*, 318 Or. App. at 719 (quoting *State v. Maciel-Figueroa*, 361 Or. 163, 182, 389 P.3d 1121

(2017)). "The officer's suspicion must be particularized to the individual based on the

individual's own conduct." *Id.* (internal quotations omitted). The officer need not have probable

cause to make the stop, but cannot rely on speculation. *Id.*

Oregon has also codified standards for investigatory stops:

> (1) A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.
> (2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.
> (3) The inquiry shall be considered reasonable if it is limited to:
>> (a) The immediate circumstances that aroused the officer's suspicion;
>> (b) Other circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of criminal activity; and
>> (c) Ensuring the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

Or. Rev. Stat. ("O.R.S.") § 131.615. The statute "is not the exclusive authority for peace officers

stopping persons." *State v. Morris*, 56 Or. App. 97, 103, 641 P.2d 77 (1982).

Oregon courts require more than mere presence in a location to show reasonable suspicion. *Compare State v. Anderson*, 46 Or. App. 501, 503-04, 612 P.2d 309 (1980) (holding that officer had reasonable suspicion that defendant was about to commit larceny or burglary where defendant parked in the lot of a closed auto supply business at 1:00 am on a Saturday morning and approached the front door of the business) *with State v. Messer*, 71 Or. App. 506, 508, 692 P.2d 713 (1984) (holding that officer did not have reasonable suspicion that defendant was about to commit burglary where defendant and another person were sitting in a truck in a mall parking lot at 3:45 am and had a knife).

     B.     Application

          i.     When the Stop Began

Oregon law differs from federal law on stops effected through a show of authority without physical touching. While the federal standard requires submission to a show of authority for a person to be stopped, the Oregon Constitution does not. *State v. Puffenbarger*, 166 Or. App. 426, 433, 998 P.2d 788 (2000), *overruled in part on other grounds by Ashbaugh*, 349 Or. 297.

> A verbal encounter rises to the level of a seizure when the content of the questions, the manner of asking them, or other actions that the police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen.

*Reyes-Herrera*, 369 Or. at 58 (internal quotations omitted). Courts are to "examine the totality of the circumstances" to determine whether a person was stopped. *Id.* at 59 (internal quotations omitted).

In *Reyes-Herrera*, a uniformed officer parked his car in an alley and approached the defendant on foot. *Id.* at 66. The defendant was also on foot. *Id.* The officer "told defendant that he had observed defendant walk away from a conversation with another man who was counting money and asked defendant whether defendant had purchased drugs from the man and whether

he was in possession of drugs." *Id.* After the defendant said no, the officer asked to search him. *Id.* The Oregon Supreme Court concluded that the officer had seized the defendant because his communication with the defendant conveyed that he suspected the defendant of criminal activity and was investigating him rather than just seeking his cooperation. *Id.* In contrast, the Oregon Court of Appeals concluded that the defendant was not seized where he was parked at the drive-through window of a closed restaurant and the officer parked fifty feet away, approached the defendant's vehicle on foot, and questioned the defendant about his driving. *State v. True*, 324 Or. App. 621, 627, 527 P.3d 42 (2023). The officer told the defendant he had not observed any traffic violations and also told the defendant he was not stopped. *Id.* at 628.

Although it is a close call, the Court concludes that the stop began when Defendant Baker asked Plaintiff if he had stolen the Honda. Viewing the facts in the light most favorable to Plaintiff, Defendant Baker pulled into the parking lot of the OK Tires shop, got out of his patrol car, walked over to Plaintiff, and asked him without preamble if he was stealing the Honda. Garza Dep. 41:15-18. Video footage of this initial interaction shows that the tire shop parking lot had no fence or barrier from the street, that Defendant Baker was in uniform but had no weapon drawn, and that Defendant Baker stopped several feet from Plaintiff when speaking with him. Montoya Decl. Ex. 4 at 1:10-20. Those factors point toward a less coercive atmosphere than the alley in *Reyes-Herrera*. But an objectively reasonable person would conclude that Defendant Baker's question indicated that Plaintiff was the subject of a criminal investigation and that he was not free to leave. Defendant Baker did not temper his questioning, unlike the officer in *True*. A reasonable person would interpret the question as one intended to restrain Plaintiff's liberty and not merely to request cooperation. The stop began when Defendant Baker asked Plaintiff if

he was stealing the Honda.[2] The Court now turns to whether Defendant Baker had reasonable suspicion to stop Plaintiff.

ii.     Subjective Suspicion

Defendants acknowledge that Oregon law, unlike federal law, injects a subjective component into the reasonable suspicion analysis. Def. Reply 9. Plaintiff points to evidence that Defendant Baker was not sure whether he was observing a car theft or innocent behavior when he first pulled into the parking lot. Pl. Resp. 3 (citing Baker Dep. 35:1-4). Defendant Baker wrote in his police report that when he pulled into the parking lot of the tire shop, he did not know whether he was observing a car theft in progress or something completely innocent. Baker Dep. 35:1-4. In *Brown*, the Oregon Court of Appeals found that it was "a close question" as to whether the officer had subjective suspicion that the defendant committed unauthorized use of a vehicle where the officer testified that she believed the defendant was a passenger in a stolen vehicle and that an innocent person would not leave the scene, but she also testified that she "didn't know what was going on" and that she didn't know if the defendant was a victim, a suspect, or a witness. 318 Or. App. at 720 n.6. Although the *Brown* court did not decide the issue, its reasoning indicates a close question here as well. On the record before this Court, a reasonable jury could conclude that Defendant Baker did not subjectively suspect that Plaintiff had committed or was about to commit vehicle theft. The Court now turns to whether Defendant Baker's suspicion was objectively reasonable.[3]

---

[2] If the stop did not begin with Defendant Baker's question, it began moments later when Defendant Baker put his hands on Plaintiff after Plaintiff walked away from him.

[3] As discussed above, Plaintiff's arguments about the potential role of race in Defendant Baker's decision to investigate fail because the only evidence of racial bias in the record is not probative of Defendant Baker's motives.

iii.    Objective Suspicion

The objective standard for reasonable suspicion under Oregon law is similar to the federal standard, and the parties largely echo their prior arguments and support them with citation to state law. The same facts supporting reasonable suspicion under federal law support objectively reasonable suspicion under Oregon law. Defendant Baker saw Plaintiff sitting in a dusty vehicle in the parking lot of a closed tire shop in the middle of the night with the vehicle's hood and door open and two other men standing nearby. Baker Dep. 28:4-7, 10-11; 31:1-3. It was objectively reasonable for Defendant Baker to suspect that Plaintiff had committed or planned to commit vehicle theft.

In arguing that Defendant Baker did not have objectively reasonable suspicion, Plaintiff relies heavily on *Brown*, Pl. Resp. 7, while Defendants argue that *Anderson* is a closer case, Def. Reply 9. In *Brown*, the police officer relied on the following in support of reasonable suspicion to stop a vehicle for unauthorized use of a motor vehicle: the vehicle was of a kind that is an easy target for theft, the vehicle was registered to two females from another town but the occupants were one male and one female, and the vehicle drove in an elusive manner. 318 Or. App. at 715-16. In holding that the officer's belief was not objectively reasonable, the Oregon Court of Appeals stated that the first two factors were entitled to little weight, particularly as the officer had run the license plate and determined that the car had not been reported as stolen. *Id.* at 720-21. The driver's elusive behavior gave some support to the suspicion that the vehicle was stolen but could have indicated other reasons to flee the police. *Id.* at 721-22. More significantly, reasonable suspicion based on the driver's conduct did not create individualized suspicion about the defendant, who was the passenger. *Id.* at 722. And although the defendant walked away from the scene after the driver fled, this "add[ed] little to the reasonable suspicion calculus." *Id.*

In *Anderson*, the defendant was driving behind a police car around 1:00 am on a Saturday morning. 46 Or. App. at 503. "He turned into the parking lot of an automobile supply business and parked his automobile. He left his automobile and was approaching the front door of the building when he was stopped by the police officer. The business was closed." *Id.* The officer thought the defendant was going to commit burglary. *Id.* He asked the defendant what he was doing, and the defendant said he was there with the owner's permission to pick up some parts. *Id.* The officer asked the defendant for his driver's license, and when the defendant could not produce it, he detained the defendant while he ran a records check. *Id.* The officer discovered that the defendant's license was suspended. *Id.* The Oregon Court of Appeals held that the officer had reasonable suspicion to stop the defendant. *Id.* at 503-04.

This case has features in common with both *Brown* and *Anderson*. Defendant Baker, like the officer in *Brown*, relied on the type of vehicle as one that is more easily stolen. Baker Dep. 31:21-24. Under *Brown*, this is entitled to only minimal weight.[4] But like the defendant in *Anderson*, Plaintiff was in the parking lot of a closed auto supply business in the middle of the night, and claimed to be there with the owner's permission. Plaintiff did not approach the door of the building, but he was sitting inside a dusty vehicle with the hood and one door open and two other men standing around him. And Defendant Baker relied on Plaintiff's own conduct, not the conduct of other individuals, unlike the officer in *Brown*. *Anderson* and *Brown* point to the conclusion that Defendant Baker had reasonable suspicion to stop Plaintiff.

Plaintiff also relies on *Anfield*, 95 Or. App. at 571, and *State v. Dawson*, 282 Or. App. 335 (2016). Both are inapposite. In *Anfield*, the State conceded that officers lacked reasonable

---

[4] *Brown* was decided after the incident giving rise to this case, so it could not have provided notice to Defendant Baker on this issue.

suspicion to stop the defendant where he "was merely walking down the street at night, in a 'high crime' neighborhood, carrying a bag." 95 Or. App. at 571. Plaintiff was in the parking lot of a closed private business that worked on cars, sitting in a car. And in *Dawson*, although the officer lawfully stopped the defendant for driving without a front license plate, he exceeded the scope of a permissible stop by questioning the defendant about whether he was authorized to use the vehicle. 282 Or. App. at 340. Plaintiff does not explain how this principle applies here. *See* Pl. Resp. 8. He points to no facts showing that he was detained beyond the time required to confirm his identity and right to be at the tire shop and the ownership of the Honda. Nor does he point to any facts showing that Defendant Baker questioned him about crimes beyond the scope of those matters. Defendant Baker had objectively reasonable suspicion to stop Plaintiff and did not exceed the scope of that suspicion. The Court now evaluates whether the restrictive measures Defendant Baker employed converted the stop into an arrest.

                    iv.    Whether the Stop Became an Arrest

Oregon law, like federal law, employs a totality-of-the-circumstances analysis in determining whether a stop becomes an arrest. As the Oregon Court of Appeals recently observed, "[t]he distinction between stops and arrests is sometimes a murky one, but generally speaking, arrests and stops differ in the scope, duration, and degree of the restraint." *State v. Madden*, 315 Or. App. 787, 792, 502 P.3d 746 (2021). "Handcuffing a suspect is generally, though not always, a restraint that exceeds the scope of a stop." *Id.* "An officer confronted with safety concerns may handcuff a person without converting the stop into an arrest, but the stop is converted into an arrest if the officer continues to use force to restrain the person after the officer's safety concerns have dissipated." *State v. Hebrard*, 244 Or. App. 593, 598, 260 P.3d 759 (2011) (holding that police officers converted a stop into an arrest when they handcuffed the

four suspects, who had their hands in the air and were cooperative). Even a period as short as "several minutes" of handcuffing after safety concerns have dissipated weighs in favor of finding that a stop became an arrest. *Madden*, 315 Or. App. at 793. Confining a suspect in a patrol car without handcuffs will not convert a stop into an arrest where it is reasonably necessary to control the scene for an investigation. *State v. Werowinski*, 179 Or. App. 522, 529, 40 P.3d 545 (2002) (holding that stop was not converted into arrest where defendant was placed in patrol car without handcuffs and officer needed to control the scene to investigate reports of a fight).

The Court concludes that, viewing the facts in the light most favorable to Plaintiff, the stop was converted into an arrest. Initially, it was reasonable for Defendant Baker to handcuff Plaintiff. Unlike the suspects in *Hebrard*, Plaintiff was uncooperative: he asked Defendant Baker why he was there, turned and walked away from him, and swore at him when Defendant Baker first tried to restrain him. Garza Dep. 41:20-25; 42:9-13; 58:15-18. Defendant Baker was the only officer at the scene at that time, and there were two persons of interest present in addition to Plaintiff. Under those circumstances, the decision to handcuff Plaintiff was reasonable and did not on its own convert the stop into an arrest.

Plaintiff argues that "[o]nce other officers arrived, no possible justification for continuing to keep Plaintiff cuffed in the squad car could have existed[.]" Pl. Resp. 9. Viewing the facts in the light most favorable to Plaintiff, Defendant Baker punched Plaintiff while he was handcuffing him, and Plaintiff was not resisting. And it is undisputed that Plaintiff was placed in the patrol car for approximately ten minutes and was handcuffed during that time. While Defendant Baker expressed concern that Plaintiff could obtain something that could be used as a weapon, he did not express fear that Plaintiff had a weapon on his person. Baker Dep. 41:1-6. Nor did he point to any objectively reasonable fear that Plaintiff would attempt to assault him

using his arms or hands. Two officers responded to the scene within two minutes after Defendant Baker handcuffed Plaintiff. Montoya Decl. Ex. 4 at 1:34-3:20. No evidence in the record indicates that Plaintiff was verbally abusive or disruptive after he had been handcuffed and placed in the patrol car. Under those circumstances, the combination of handcuffing Plaintiff (and punching him while doing so) and placing him in the patrol car for approximately ten minutes was more restrictive than necessary to ensure officer safety and facilitate the investigation. Viewing the facts in the light most favorable to Plaintiff, the stop was converted into an arrest. Defendant Baker does not contend that he had probable cause to arrest Plaintiff, and the record shows that he did not. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's state-law false arrest claim.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment [24] is GRANTED with respect to Plaintiff's Fourth Amendment false arrest claim and DENIED with respect to Plaintiff's state-law false arrest claim.

IT IS SO ORDERED.


DATED:  September 4, 2023      .




MARCO A. HERNANDEZ
United States District Judge